**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**AT COVINGTON**
**CIVIL CASE NO: 04-187-JGW**

**MAYSVILLE MARKETSQUARE**
**ASSOCIATES LIMITED PARTNERSHIP,**                    **PLAINTIFF**

**V.**

**THE KROGER CO.,**                                   **DEFENDANT.**

**MEMORANDUM OPINION AND ORDER**

The court has before it cross-motions for summary judgment in this litigation, which involves a contractual dispute between the parties.[1]  For the reasons discussed herein, plaintiff's motion for summary judgment will be denied, while defendant's motion will be granted.  Judgment will be entered in favor of the defendant, and the pending final pretrial and trial dates will be vacated.

**I.  Background**

On October 17, 2005, the parties filed a joint stipulation of facts which reflects that few disputes remain between them.   The plaintiff, Maysville Marketsquare Associates Limited PARTNERSHIP ("Maysville Marketsquare") and the defendant, The Kroger Co. ("Kroger), entered into a Lease Agreement ("Lease") on April 20, 1993, in which Kroger leased a tenant space in the Maysville Marketsquare Shopping Center from the plaintiff.  In the lease, Kroger agreed to pay its proportionate share of "common area maintenance" ("CAM") charges.  Maysville Marketsquare and Kroger presently dispute the amount of Kroger's pro rata share of CAM charges for 2003 and 2004.

---

[1] The parties have consented to disposition of the pending motions, and a bench trial if necessary, by the undersigned magistrate judge pursuant to 28 U.S.C. §636(c).

Kroger contends that it has overpaid its share of the total CAM charges for 2003 and 2004, while Maysville Marketsquare contends that Kroger has underpaid. Only one aspect of the CAM charges billed by Maysville Marketsquare is disputed: the inclusion of the salaries of Clarence Botkin, the Maysville Marketsquare Shopping Center on-site manager, and the salaries of Mr. Botkin's assistants.

## II. Analysis

The construction and interpretation of a contract are questions of law for the court to decide. *See FS Investments, Inc. v. Asset Guaranty Insurance Co.,* 196 F. Supp. 2d 491, 497 (E.D. Ky. 2002). If the language of a contract is unambiguous, the meaning of the language is a question of law, and the intent of the parties must be discerned solely from the words used in the contract. *Luttrell v. Cooper Industries, Inc.,* 60 F. Supp.2d 629, 631 (E.D. Ky. 1998)(citations omitted)). This court begins, then, with the express language of the contract. Paragraph 22B governs the payment of CAM charges, and reads in full:

> B. <u>COMMON AREA MAINTENANCE REIMBURSEMENT.</u> Commencing on the date upon which Rentals become due hereunder Tenant, shall pay Tenant's pro rata share of Landlord's operating cost of the Common Areas, as hereinafter defined, in the manner hereinafter provided. Landlord shall furnish Tenant with the backup invoices and documentation necessary to evidence the work performed and the payment made therefor, and the manner in which Tenant's pro rata share was calculated. Tenant shall reimburse Landlord annually for such pro rata share within thirty (30) days after its receipt of the invoice an documentation set forth above. Tenant's pro rata share shall be in the ratio that the square footage of building area in the Demised Premises bears to the total square footage of all building area in the Shopping Center (specifically excluding the Wal-Mart Store on the contiguous parcel). ***Tenant in no event shall be responsible for any portion of Landlord's costs associated with or related to (i) office overhead, salaries, depreciation and administrative costs, (ii) replacements of capital items, (iii) individual expenditures in excess of $25,000 which typically would be capitalized as opposed to expensed***.
>
> For the purposes of this Paragraph 22B, "Landlord's Operating Cost of the

> Common Areas" is defined as including all of Landlord's costs and expenses of operating and maintaining the Common Areas in the Shopping Center, and shall be deemed to include, but not limited to, landscaping, snow removal, cleaning, utilities (but not electric), fire protection, security, traffic control signs, patching not in excess of $5,000 per year, restriping, policing, Common Area trash removal, sewage disposal, and an administrative fee equal to three percent (3%) of the Landlord's Operating Cost of the Common Areas.

(Emphasis added). For purposes of the Lease, Maysville Marketsquare is defined as the "Landlord" and Kroger as the "Tenant." The lease was drafted by Kroger.

Maysville Marketsquare operates through its partner, parent company Pan Pacific Retail Properties. In fact, it is Pan Pacific Retail Properties which has provided Kroger with backup documentation for the disputed 2003-04 CAM charges. Pan Pacific sent invoices to Kroger from West Coast Property Maintenance LLC, another subsidiary of Pan Pacific, for "labor services." The invoices reflect the salary and benefits for Clarence Botkin and his nephew, Gary Botkin, who assisted him. The total amount of salaries in dispute for 2003 is $62,345.60, and the total amount of salaries in dispute for 2004 is $65,249.56.

If Kroger is not responsible for those salaries, then Maysville Marketsquare owes Kroger $58,136.94, representing overpayment of CAM charges for 2003 and 2004. However, if Kroger is responsible for the salaries, then Kroger owes Maysville Marketsquare an additional $4,801.81.

**Whose Cost is It? Defining "*Landlord's* costs"**

Maysville Marketplace first argues that because only Maysville Marketplace is defined as the "Landlord" under the Lease, and Maysville Marketplace did not directly pay Mr. Botkin's salary, the terms of the lease do not require the exclusion of that salary. However, Maysville Marketplace has no employees; it is operated by Pan Pacific. Maysville Marketsquare designated three 30(b)(6) witnesses

3

on its behalf, all of whom are employees of Pan Pacific. Pan Pacific signed the Lease and supplies the CAM bills to Kroger, along with supporting documentation in accordance with the Lease. Therefore, for purposes of the Lease, Pan Pacific and Maysville Marketsquare clearly operate as a single "Landlord." Moreover, the language of the Lease excludes not just salaries directly paid by the defined "Landlord" but also any "costs associated with or related to" "salaries... and administrative costs" paid by the Landlord. Even if Pan Pacific and Maysville Marketsquare were not a single "Landlord" under the Lease, a salary which is paid by Pan Pacific on behalf of Maysville Marketsquare would be excluded from being included in CAM charges under the terms of the Lease as a cost "associated with or related to" a salary paid by the Landlord.

The next obvious question is whether Mr. Botkin's salary actually should be considered as paid on behalf of Maysville Marketsquare. Plaintiff argues that because Mr. Botkin has not been employed by Pan Pacific since 2002, his salary should not be considered as excluded by ¶22B. The record reflects that in 2003 and 2004, Mr. Botkin's salary was paid by West Coast Property Maintenance, the "on-site manager" for the Maysville property. Mr. Botkin became employed by West Coast Property Maintenance when West Coast was created for tax reasons. *See, e.g.,* Deposition of Jeffrey Stauffer, Vol. I. at pp. 24-26.

Pan Pacific and its subsidiary, West Coast Property Maintenance, share the same street address. Pan Pacific is listed as the "customer" on the West Coast Property Maintenance invoices, notwithstanding the fact that services are performed on behalf of Maysville Marketplace. The check from Pan Pacific is made payable to West Coast. Given the close relationship between the three entities, and the express language of the Lease, I conclude that Mr. Botkin's salary is in fact a salary

4

which is passed through from West Coast to Pan Pacific and is therefore a cost which is "associated with or related to" a salary paid on behalf of the Landlord under ¶22B.

### When is a Salary Not A Salary?

Aside from arguing that the salary is not a covered "salary" because it is paid by West Coast Property rather than by Maysville Marketplace directly, the plaintiff argues that the salary should not be included within the terms of ¶ 22B because it reflects the real costs of common maintenance for the property in question. Mr. Botkin testified that he spends "80 to 90 percent" of his time cleaning the site, overseeing or supervising repairs to the parking lot or lighting, removing snow from the parking lot and sidewalks, and other maintenance activities. Mr. Botkin testified that the remainder of his time is spent assisting individual tenants performing interior repairs, and otherwise preparing unleased properties for releasing. Mr. Botkin hires third parties to perform some work, and occasionally has hired assistants, including his nephew, to help him with his duties.

Because most of the items specifically included in the "Landlord's Operating Cost of the Common Areas," such as snow removal, trash removal, etc., were all performed by Mr. Botkin and/or his assistant, "it would not make sense to exclude his salary from the legitimate common area maintenance expenses." Plaintiff makes an argument based on equity that if Mr. Botkin's salary were excluded, most of the expenses incurred by the Landlord for CAM charges would be excluded. Maysville Marketsquare urges this court to rule that the inclusion of "80 to 90 percent" of the disputed salaries are legitimate CAM charges under the Lease, based upon Botkin's testimony that he devotes the same percentage of his time to maintenance duties.

To adopt plaintiff's interpretation would require this court to conclude that the language of ¶22B

5

is ambiguous. Maysville suggests that the word "salaries" is awkward and susceptible to two meanings - either all salaries, as suggested by Kroger, or just limited salaries of Maysville Marketplace such as those relating to its corporate headquarters. Plaintiff argues that the parties' intent must have been to refer only to the salaries and overhead associated with the plaintiff's Vista, California office, not those expenses relating directly to maintenance costs and fees, even if technically those costs include "salaries."

The difficulty with plaintiff's argument is that a party challenging contractual language "must make its showing of ambiguity *without* resorting to extrinsic evidence. If the contract provision is not ambiguous on its face, the court must enforce it as written." *Schachner v. Blue Cross and Blue Shield of Ohio*, 77 F.3d 889, 894 (6th Cir.), *cert. denied* 519 U.S. 865 (1996). In this case, the contractual provision at issue simply is not ambiguous. The words of a contract are to be given their plain meaning, and in the absence of ambiguity, will be enforced strictly according to their terms. *Millenium Petrochemicals, Inc. v. C.G. Jago*, 50 F. Supp.2d 654, 657 (W.D. Ky. 1999)(internal citations omitted). Since the terms of the contract are unambiguous, there is no cause for this court to review extrinsic evidence relating to those terms. "In reviewing contractual agreements, a court is not permitted to create an ambiguity where none exists, and an otherwise unambiguous contract does not become ambiguous merely because one of the parties asserts, post hoc, that the contract failed to state what the parties truly intended." *Southern Comfort Waterbeds*, 2004 U.S.Dist. LEXIS 24288, 2004 WL 259952 (W.D. Ky. 2004); *see also Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.,* 94 S.W.3d 381, 385 (Ky. App. 2002)(*citing Green v. McGrath,* 662 F.Supp. 337, 342 (E.D.Ky.1986))("The fact that one party may have intended different results...is insufficient to construe a contract at variance

with its plain and unambiguous terms").

**Course of Dealing**

Finally, plaintiff suggests that this court can "interpret" the language of the contract in plaintiff's favor because Kroger paid CAM charges which included salaries for over a decade before the instant dispute. However, Kroger has submitted evidence that Kroger was unaware of the fact that the CAM charges included "salaries" during the time period in which those charges were paid; therefore, plaintiff may not rely on the parties' "course of dealing" to reform the plain language of the contract.[2]

**Interest**

Kroger asserts that it is entitled to prejudgment interest at the annual rate of 8%. Prejudgment interest is available as a matter of course under Kentucky law for breach of contract claims when the amount in question is liquidated. Where the amount is unliquidated, prejudgment interest is within the discretion of the court. I conclude that the amount of the salaries in question was sufficiently liquidated so as to qualify for the imposition of prejudgment interest, accrued from the date of the filing of Kroger's counterclaim until the date of judgment.

Kroger also asserts entitlement to post-judgment interest at the rate of 12% as established by Kentucky law. However, the Sixth Circuit recently reaffirmed that in diversity cases, federal law controls postjudgment interest, even where state law governs awards of prejudgment interest. *Estate of Riddle v. Southern Farm Bureau Life Ins. Co.*, 421 F.3d 400, 409 (6th Cir. 2005). Therefore,

---

[2]As recently as May 2004, Maysville Marketsquare, through counsel, denied Kroger's expressed "suspicion" that some of the CAM charges were for Mr. Botkin's salary. *See* May 4, 2004 letter from J. Schumacher to K. Peyton, Exh. 7 to Kroger's reply memorandum.

Kroger is entitled to postjudgment interest only at the rate specified under federal law.

Finally, Kroger urges the court to award it costs and fees. Such an award is within the discretion of this court. The court will award Kroger its costs, but will deny the request for attorney's fees.

### III. Conclusion and Order

Accordingly, **IT IS ORDERED THAT:**

1. Plaintiff's motion for summary judgment [DE #46] is **DENIED**;

2. Defendant's motion for summary judgment [DE #47] is **GRANTED**;

3. Judgment will be entered in favor of the defendant, The Kroger Company, in the amount of $58,136.94, with prejudgment interest to accrue at 8% per annum since September 7, 2004, and post-judgment interest to accrue at 4.30% per annum from the date of judgment;

4. Costs shall be awarded to the defendant, The Kroger Company, but defendant's request for attorney's fees is **denied**;

5. The final pretrial conference of November 29, 2005 and trial date of December 5, 2005 are hereby **vacated**.

This 29th day of November, 2005.



Signed By:
*J. Gregory Wehrman*
United States Magistrate Judge